(C.D. 2455)

BORDER BROKERAGE CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 14, 1964)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*James F. O'Hara* and *Herbert L. Warren*, trial attorneys), for the defendant.

Before OLIVER and WILSON, Judges

WILSON, Judge: The plaintiff in this action challenges the classification of certain sperm oil imported from Canada. The merchandise is described on the commercial invoices in most cases as "tankcar SPERM OIL (CRUDE) from which some free oil has been removed." The collector assessed the imported product as "Sperm oil, refined or otherwise processed" under paragraph 52 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, and levied duty at the rate of 3½ cents per gallon. The plaintiff claims the merchandise properly classifiable under the same paragraph, as modified, *supra*, as crude sperm oil, dutiable at 1¼ cents per gallon.

The plaintiff has abandoned item KTX 8901 on entry number 05-7261, which is described as "SPERM OIL, wintered by cooling and filtering, containing approximately 60,000 lbs."

The record in the case of *United States* v. *Border Brokerage Co. et al.*, 47 CCPA 75, C.A.D. 732, was incorporated in these proceedings.

It appears from the testimony in the incorporated case that the process of removing this spermaceti wax may be either by subjecting the natural sperm oil to suitable natural temperatures or by controlling the temperatures artificially. The testimony in the incorporated case was summarized by our appellate court (page 76) as follows:

From the testimony offered by both parties it appears that sperm oil, when removed from the whale, is a cloudy oil which contains a substantial quantity of spermaceti wax, a substance which is not desired in imports such as those at bar. The oil is clarified by the removal of a portion of the spermaceti wax to produce the 45 N.W. (natural winter) grade of oil here in issue. This is done by allowing the oil to stand at a temperature of 45 degrees F., at which temperature a portion of the spermaceti wax will settle from the oil. The supernatant oil having a reduced wax content is then drawn off. If the temperature of the untreated oil varies from 45 degrees F., it may be artificially heated or cooled as required to reach the desired 45 degrees F. temperature. The process results in a product known as 45 N.W. (natural winter) sperm oil, which may be cooled to a temperature of 45 degrees F. before it becomes cloudy. The untreated oil as it comes from the whale must have its spermaceti wax content reduced before it is suitable for the uses for which it is imported.

Our appellate court, in the incorporated case, held the sperm oil there involved directly classifiable as refined or otherwise processed sperm oil within the provisions of paragraph 52 of the tariff act, as modified, *supra*. In so holding, the court, page 77, stated:

The subjecting of the crude oil to the 45 degrees F. temperature, followed by the precipitation, and subsequent removal of a portion of the spermaceti wax fraction thus can be considered either as "refining," i.e., a purifying of the oil or as a "processing," i.e., changing the proportions of the chemical constitutents of the sperm oil due to the reduction in content of the cetyl palmitate (spermaceti wax).

In our opinion the facts in the present case permit this direct classification of the imported de-waxed sperm oil in the second category of paragraph 52 without requiring the court to first determine whether such an oil is "crude." For this reason, we do not think it necessary to here consider or apply the general tests of the prior cases cited by the Customs Court as supporting its decision.

It is our opinion, therefore, that the oil in issue is a de-waxed oil as a result of processing embraced within the terms "refined" or "otherwise processed" and as such that it is directly within the second category of paragraph 52 of the Tariff Act of 1930 as modified. * * *

The facts in the case now before us are really not controverted. The exporter of the involved merchandise received from the whaling industry certain tankcars containing sperm oil derived from reducing or rendering the head, blubber, and other portions of the bodies of sperm whales. There had been no effort to separate the oil derived from the head from that produced from other portions of the whales' anatomy. The oil in the same condition as it was derived from the whales was shipped to the exporter. Up to this point, the facts in the instant

case are identical with the facts in the incorporated case. However, in the incorporated case, the sperm oil which contained a high percentage of spermaceti wax was artificially treated so as to place the natural oil in an environment of 45 degrees F., at which temperature a high percentage of the spermaceti wax, an undesirable constitutent of the oil, was precipitated to the bottom of the tank. The oil was then pressured through filters. The filtered product constituted the merchandise involved in the incorporated case. In the present case, the natural oil was shipped from its point of origin to the exporter, which, according to the testimony of Dr. William Chalmers, the only witness called in the case, permitted the oil to stand in the tanks "from the time of production, from any period between May and July, through until the subsequent April of the following year" (R. 25). It further appears from the testimony of the same witness that, during that period of time, the temperature varied from a maximum of 80 degrees F. to a minimum of about 5 degrees F., and that, during that period of time, spermaceti wax settled to the bottom of the tank. In fact, Dr. Chalmers testified specifically as follows:

X Q. Are you prepared to state that at the time the top oil was drawn off, no spermaceti wax had settled to the bottom?—A. Oh, definitely the spermaceti had settled to the bottom.

X Q. And then the top oil was drawn off, and what was left is what we have in this case?—A. That's right; yes.

X Q. Now, the chemical properties of the top oil would not be the same, then, as the chemical properties of the oil remaining in the vat after the top oil is drawn off?—A. That is true.

X Q. The proportions of the chemical elements would have changed?—A. That's right, yes. [R. 26.]

In the case at bar, the plaintiff contends that the imported sperm oil is not the same as the natural winter sperm oil involved in the incorporated case; that there has been no de-waxing operation performed on the sperm oil involved herein; and that "In fact, if anything, the reverse has happened. By pumping off some top oil, that which remained had more wax than a mixture of head, body and blubber oil. However, it was identical in its chemical constituents to head oil which as reduced from the mammal has more wax naturally than body or blubber oil." (Plaintiff's brief, page 6.)

In the incorporated case, the supernatant oil was drawn off and was the product exported. In the present case, the supernatant oil was also drawn off. The remaining or bottom oil, allegedly containing a higher concentration of spermaceti wax than that contained in the sperm oil as it came from the whale, constituted the merchandise exported in the case now before us. The only issue before us then is whether the sperm oil in the condition as imported was "processed," in

the sense in which that term is used in the tariff provision now under consideration. In our opinion, the present case is controlled by the decision in *United States* v. *Border Brokerage Co. et al.*, 47 CCPA 75, C.A.D. 732, being the case incorporated herein.

It is clear that before exportation of the sperm oil in question, it was subjected to natural temperature changes so as to cause the precipitation of spermaceti wax. At this point, it was a processed oil, as defined in the incorporated case. Without further processing or treating of any sort, a portion of the oil, the supernatant fraction, was drawn off from the tank. The classification of this supernatant oil, it is conceded, is controlled by the appellate court decision, *supra*. It is clear that merely removing part of the oil was not processing the oil. It would appear, however, that all of the oil in the various tanks involved had been "processed" according to the tariff meaning attributed to that word by the appellate court in the incorporated case. Did the removal of the supernatant fraction from the sperm oil restore the remaining oil to a condition which entitled it to classification as a crude oil, dutiable at the lower rate of $1\frac{1}{4}$ cents per gallon? We think not. Plaintiff's witness agreed that the chemical properties of the top oil would not be the same as the chemical properties of the oil remaining in the vat after the top oil was drawn off, but that "the proportions of the chemical elements would have changed" (R. 26). All the oil in the tanks having been processed, separating the processed oil into two parts would not, in our opinion, entitle the merchandise remaining in the tanks after the removal of the clarified oil to classification as crude sperm oil.

For the reasons above stated, we hold the involved merchandise properly dutiable under paragraph 52 of the Tariff Act of 1930, as modified, *supra*, at the rate of $3\frac{1}{2}$ cents per gallon as processed sperm oil under the provisions of said paragraph for "Sperm oil, refined or otherwise processed," as classified. The protest claim having been abandoned as to item KTX 8901 covered by entry number 05–7261, the same is dismissed. As to the remaining merchandise covered by the involved protest, the protest is overruled.

Judgment will be rendered accordingly.